IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| ROBERT MARBERGER | ) | |
| | ) | |
| Plaintiff, | ) | C/A No.: 3:22-cv-02375-MGL |
| | ) | |
| -vs- | ) | **PLAINTIFF'S *DAUBERT* MOTION AND** |
| | ) | **MEMORANDUM TO EXCLUDE** |
| JEREMY R. NIVENS and | ) | **DEFENSE EXPERTS** |
| DZYK TRANSPORTATION SERVICES, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### I.     INTRODUCTION

Plaintiff, Robert Marberger sustained severe injuries including thirteen fractured bones, a laceration to his left eye, spinal trauma, and a brain injury in the trucking crash which is the subject of this action. Defendant DZYK Transportation Services, LLC ("DZYK") has hired two experts – Brian Boggess, PE and Christopher Watson, M.D. – whom they intend to have testify regarding the mechanism and cause of Plaintiff's injuries. Expert witnesses are meant to clarify the issues for the jury, not cloud them. Expert testimony must be the product of reliable principles and methods reliably applied to sufficient facts and data. *See* Rule 702(b)-(c), Fed. R. Civ. P. Boggess and Dr. Watson fail this test. Thus, Plaintiff asks the Court to exclude their testimony at the Trial of this case.[1]

---

[1] A full explanation of this Motion is contained within this Motion; thus, no separate Memorandum of Law accompanies this Motion.

## II.    FACTUAL BACKGROUND

*A.    Issues before the Court.*

On September 9, 2021, Marberger was involved in a motor vehicle crash with Nivens and another tractor trailer in Sumter County, South Carolina. *See e.g.,* ECF No. 42 (Amended Complaint) at Paragraphs 6-8. At issue are (1) the sequence of collisions between Marberger, Nivens, and the other tractor trailer, (2) the causation of Marberger's injuries, and (3) the permanency of Marberger's injury to his eye. DZYK and Nivens hired Boggess to offer opinions regarding the sequence of collisions and Watson to offer testimony regarding Marberger's injuries. *See* ECF # 74, Defendants' ID of Expert Witnesses.

*B.    Legal Standard for Expert Testimony*

Federal Rules of Evidence 104(a) and 702 require this Court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Before permitting an expert to testify before the jury, the proponent of that expert must satisfy this Court, by a preponderance of the evidence, that "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. Whether testimony will assist the trier of fact depends on whether the testimony is relevant to at least one issue in the case. Helpful testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *See Daubert*, 509 U.S. at 591 (citation omitted). Expert witnesses must also be qualified by "knowledge, skill, experience, training, or education" in the area on which they offer testimony. Rule 702, Fed. R. Evid.

"Scientific knowledge" is testimony "ground[ed] in the methods and procedures of science" and consisting of "more than subjective belief or unsupported speculation." *Daubert*, 509

U.S. at 589–90. The testimony must arise from a reliable principle or method which the purported expert reliably applied to sufficient facts and data. *See* Rule 702(b)–(d), Fed. R. Evid. "Many factors" bear on whether testimony meets this standard. *Daubert*, 509 U.S. at 593. A "key question" in deciding whether testimony constitutes scientific knowledge is "whether it can be (and has been) tested." *Id.* This is because a scientific methodology both generates hypotheses and tests them "to see if they can be falsified." *Id.* (citation omitted). This "falsifiability, or refutability, or testability" is "[t]he criterion of the scientific status of a theory." *Id.* (citation omitted). Courts also consider (1) whether a theory has been subjected to peer review and publication, (2) what a particular technique's known or potential error rate is, *id.* at 593–94, and (3) whether the "expert developed his opinions expressly for the purposes of testifying" or "through 'research they have conducted independent of the litigation,'" *see In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 174 F.Supp.3d 911, 920 (D.S.C. 2016) (citations omitted); *see also Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("Daubert II") ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.").

Rule 704(a), Fed. R. Evid., permits an expert to opine on "questions of fact that are committed to resolution by the jury." *U.S. v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006). An expert may not, however, offer opinion testimony "that states a legal standard or draws a legal conclusion by applying law to the facts." *Id.* at 561–62. Such testimony "would merely tell the jury what result to reach" and is "inadmissible." *Elat v. Ngoubene*, 993 F.Supp.2d 497, 512 (D. Md. 2014) (collecting authorities for the proposition that expert testimony that "supplies the jury with no information other than the witness's view of how the verdict should read" is inadmissible).

### III.  ARGUMENT

*A. Watson's medical testimony is inadmissible because Watson employs no scientific method, developed his opinions solely for litigation, and could not assist the jury in determining facts in issue.*

Watson offers two opinions related to Marberger's injuries (1) all of Mr. Marberger's injuries occurred from the first impact; (2) there will be little to no permanent disability other than his eye injury which is a result of a mistake in treatment early in Mr. Marberger's hospitalization. *See* Exhibit A, Watson's Report. As grounds for his opinions Watson offers (1) his review of Mr. Marberger's medical records, South Carolina Peace Officer report and a photo of Mr. Margerber's truck and (2) his experience as a trauma surgeon. *See* Exhibit A, Watson's Report. Because the factors recognized in *Daubert* each support excluding Watson's opinions, this Court should not permit Watson to testify.

   1. <u>Watson's "method" is not falsifiable, is not peer reviewed, and cannot be scientifically evaluated for an error rate.</u>

Watson does not apply any scientific method to reach his opinions. Instead, Watson's opinions are connected to the data—in this case, the medical records—only by Watson's "*ipse dixit.*" *Cf. General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Watson himself agrees that his "method" for reaching his opinions was reading the medical records and then writing his report. This method is not falsifiable, and falsifiability is the "criterion" that separates scientific knowledge from pure speculation. *Cf. Daubert*, 509 U.S. at 593. Watson offers no way to test either his method or his opinions. Indeed, there is no way to test and falsify or otherwise evaluate his methodology. Watson's opinions do not qualify as "scientific" or "knowledge" under *Daubert*

because they are neither "ground[ed] in the methods or procedures of science" nor "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

Granted, Watson could submit his opinions for peer review as a case report, but Watson has published no articles on either his specific opinions in this case or containing his general opinions which support those he has reached in this case. As discussed below, this suggests that Watson's opinions were developed for litigation. *Cf. In re Lipitor*, 174 F. Supp.3d at 920. Further, there is a distinction between anecdotal evidence and a reliable, controlled clinical trial, with the latter being more reliable. In other words, Watson cannot show his "[p]roposed testimony [is] supported by appropriate validation—*i.e.* 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. Put another way, Watson has taken the first step toward scientific knowledge by generating a hypothesis but has failed the crucial step of *testing* that hypothesis "to see if [it] can be falsified." *Id.* At 593.

Nor has Watson calculated his own error rate. As discussed above, Watson himself is the method—his opinions are derived from his review of the medical records. Thus, it is Watson's error rate that is at issue, which Watson has no way of knowing. Watson may also simply be persuasive without being correct—after all, *Daubert's* inquiry is necessary because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. Watson's opinions fail the key *Daubert* considerations, and this Court should thus exclude his testimony.

2. <u>Watson developed these opinions expressly for the purpose of litigation and not based on either his own or another party's independent research.</u>

Watson makes no reference or citation to studies, literature or research. Watson's opinions in this case are not based on any particular studies, literature, or research. *See* **Exhibit A**, Watson's

Report. While Watson has been employed as a trauma surgeon since 2007, he has no training as a biomechanic or in accident reconstruction. He has never performed any controlled testing related to his opinions in this case, never published any papers related to biomechanic or in accident reconstruction and never has spoken at professional conferences. *See* **Exhibit B**, Watson's CV. In other words, Watson did nothing to form the opinions he is expressing in this case before Defendant hired him to form his opinions in this case—these opinions are tailor-made for this litigation.

> B. *Watson's opinion regarding the toxicology report is inadmissible because it invades the providence of the jury and fails to consider all relevant data, resulting in an insurmountable analytical gap.*

In his report, Watson states "since there were no less than three different descriptions of the events leading up to the motor vehicle collision, I have come to my understanding of the mechanism of injury by synthesizing the data provided by the South Carolina Peace Officers report with included photos and a separate photo of the rear of Marberger's truck provided by Mr. Aaron Hayes." *See* Watson's Report, Pg 2. Watson's opinion is simply an evaluation of the weight of the evidence, not an expert opinion, and thus invades the province of the jury. Further, Watson fails to evaluate all relevant data and is not qualified to do so. He considers only the documents in the case provided to him by Mr. Aaron Hayes. This results in a significant analytical gap between the data Watson does analyze and the conclusion. Thus, this Court should exclude Watson's opinion.

Watson fails to consider how the urinalysis of Mr. Marberger he references was two weeks post motor vehicle collision. Watson is not qualified to evaluate that information in the first place, as he is neither a toxicologist nor does his report or CV reference any toxicology training. He fails to offer any explanation connecting a urinalysis positive for cannabis two weeks post motor vehicle collision to impairment at the time of the crash. He is not qualified to analyze and give an opinion

on that data in the first place, nor can he opine to its' effect on the crash, as he has not demonstrated the relevant expertise.

Watson's testimony invites the jury to substitute Watson's opinion for their own. But what conclusions are reasonable is a question for the jury. Watson's opinion is nothing but an evaluation of the weight of the evidence, which "undertakes to tell the jury what result to reach" and "does not aid the jury in making a decision but rather attempts to substitute the expert's judgment for the jury's." *Elat*, 993 F.Supp.2d at 512 (quoting *U.S. v. Chapman*, 290 Fed. Appx. 253, 269 (4th Cir. 2006)). Thus, this Court should exclude Watson's testimony regarding the toxicology report.

C.   *Boggess' opinion is inadmissible because it invades the province of the jury and fails to consider all relevant data, resulting in an insurmountable analytical gap..*

In his report and at Depo. at, Boggess lays out several opinions he intends to introduce at trial, with the sequence of the collisions between the three vehicles being the primary focus. While Boggess holds some opinions which are based up data and calculation, Boggess' primary opinion is merely his evaluation of the weight of evidence, rather than expert opinion. Mr. Boggess' primary opinion is stated as "Based upon the reconstruction, the -- it is more probable that the Chevrolet ran into the back of the International first, and that that collision -- and we can talk about the severity of it, perhaps, but -- and then the secondary, lesser degree sideswipe, corner swipe by the Peterbilt relative to the right rear corner, right side of the Chevrolet." *See, e.g.*, **Exhibit C**, Boggess Depo. Excerpts at 14:18–15:20. This opinion is fatally flawed as expert testimony because Boggess' opinion is simply an evaluation of the weight of the evidence, not an expert opinion, and thus invades the province of the jury. Thus, this Court should exclude Boggess' opinion.

(1)   <u>Boggess' opinion invades the province of the jury.</u>

Boggess' testimony invites the jury to substitute Boggess' opinion for their own. Boggess did not form his opinion by independently evaluating the physical evidence, but by reviewing the measurements of another, reviewing evidence which is testimonial in nature, and deciding what conclusions the evidence "reasonably" supported. Boggess' report begins substantively on Page 10, with his discussion of two South Carolina Crash which are inadmissible under S.C. Code Ann. § 56-5-1290. *See Riner v. Straight*, No. 8:10-CV-02117-JMC, 2012 WL 13006216, at *1 (D.S.C. Jan. 30, 2012). Boggess' opinion mirrors the content of the report and represents an attempt to filter the content of the report and pass it off as expert testimony rather than a mere recitation of inadmissible evidence. Boggess' report goes on to discuss his review of further deposition testimony, discussion between investigating officers, and dashcam video of the crash investigation. This evidence is properly evaluated by the jury in this case directly, rather than through the filter of purported expert testimony.

Boggess relays in both his report and in his deposition testimony an account of two investigating officers' review of an alleged video of the incident which has not been obtained by the parties to this action. *See,* **Exhibit D**, Boggess Report, Pg. 10; Boggess Depo. Excerpts 18:8-20:8. This video, which is not available for review and authentication, formed the basis of what the above-discussed crash reports are based on. Boggess continued reliance on information which is only abstracted from a video, which he has not seen, tends to show that his opinion is unreliable and is not based upon scientific knowledge.

Boggess offers only vague explanations of his methodology in both his report and his deposition testimony. *See* Boggess Depo. Excerpts at 16:1-18:14; He provides only circular testimony which assumes his final opinion in the methodology for arriving at this opinion. When asked how he arrived at his opinion that Marberger collided first with the International tractor

trailer ahead, and then was subsequently hit by the Peterbilt, Boggess assumes an initial side swipe stating "It is a swiping contact, so you're not getting a full vehicle-to-vehicle engagement. It is, again, coming around the right side of the Chevrolet, down the left side of the Peterbilt. But, again, that transfer of energy does not explain the magnitude of energy available within the Chevrolet to then deliver the magnitude of the frontal collision that we see." *See* Boggess Depo. Excerpts at 17:19-18:1. Boggess never makes any account for the damage, which he acknowledges exists, to the front end of the Peterbilt truck driven by Nivens. His report states, "**These photographs depict slight contact damage to the fiberglass hood and fender structure** adjacent to the left headlight, deflection of the lower driver entry step, scuffing and denting of the saddle tank, as well as a singular gouge to the sleeper berth body shell" *See* Boggess Report, Pg. 24 (emphasis added). Additionally, Boggess does not offer his own methodology explaining his own hypothesis but rather jumps directly from his rejection of Plaintiff's Expert's hypothesis to his acceptance of his final opinion. *See Boggess Report*, Pg. 29. Thus, Boggess' opinion is not based on a reliable, falsifiable scientific methodology, but his conclusions from the weight of the evidence.

But what conclusions are reasonable is a question for the jury. Boggess' opinion is nothing but an evaluation of the weight of the evidence, which "undertakes to tell the jury what result to reach" and "does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Elat*, 993 F.Supp.2d at 512 (quoting *U.S. v. Chapman*, 290 Fed.Appx. 253, 269 (4th Cir. 2006)). Boggess' opinion may be fine fodder for Defendants' cross-examination of Marberger's retained expert, but it is not the proper subject of expert testimony at trial. Thus, this Court should exclude Boggess' testimony.

## **CONCLUSION**

Each in their own way, Watson and Boggess offer flawed expert testimony. Watson begins but does not complete the scientific process, offering only untested and untestable hypotheses resulting from a method with an unknown error rate. Boggess opinion serves only to subsume the role of the jury, and to introduce otherwise faulty evidence as expert testimony. Defendants bear the burden of establishing these experts are fit to testify by a preponderance of the evidence—this is a burden Defendants have not met, and a burden they cannot meet. Thus, Plaintiff respectfully requests that this Court exclude Defendants' purported experts.

                **MORGAN & MORGAN**

                BY *s/ Lauren Carroway ,Esq.*
                Lauren Heath Carroway
                Federal ID: 13693
                1544 Fording Island Road, Suite A
                Hilton Head, South Carolina
                (854) 222-6075

Hilton Head, South Carolina                ***Attorney for Plaintiff***
March 14, 2025