IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Robert Marberger, | ) | Case No.: 3:22-02375-MGL |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANTS' RESPONSE TO** |
| | ) | **PLAINTIFF'S MOTION TO EXCLUDE** |
| Jeremy R. Nivens and DZYK Transportation | ) | **DEFENDANTS' EXPERT WITNESSES** |
| Services, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Defendants Jeremy R. Nivens and DZYK Transportation Services, LLC hereby respond to Plaintiff's Motion to Exclude Defendants' Expert Witnesses, Dkt. No. 79. Plaintiff Robert Marberger filed this Motion to exclude two defense experts, Dr. Christopher Watson, M.D. and Brian Boggess, P.E. on March 14, 2025, citing *Daubert* and Rule 702(b)-(c), FRE, claiming generally both experts did not use reliable principles and methods reliably applied to sufficient facts and data. As explained below, Plaintiff's argument is without merit and Plaintiff's Motion must be denied.

**NATURE OF THE CASE AND FACTS BEARING UPON THE MOTION**

This action arises out of a three-vehicle collision which occurred on September 9, 2021 in the right lane of I-95 northbound in Sumter County, South Carolina. (Am. Compl., at ¶ 7 (Dkt. No. 35).) The vehicles involved were all traveling in the right lane, with a tractor-trailer driven by James Miller out front, followed by a flatbed pickup driven by Plaintiff Robert Marberger, followed by a tractor-trailer driven by Defendant Jeremy Nivens. Plaintiff is expected to claim—

1

via expert testimony[1]—that his pickup was rear-ended by the Nivens unit and then propelled forward into the back of the Miller unit. Defendants—via the testimony of Mr. Nivens, Mr. Miller, and the expert opinion of Brian Boggess, P.E.—will contend that Mr. Marberger first ran into the back of the Miller unit, and then Mr. Nivens' unit came into incidental, swiping contact with the right rear and right side of the Marberger unit.

Defendants' above-referenced version of the collision leads to another key question in the case: which of the impacts did Mr. Marberger's injuries come from? Did his injuries come from 1) the incidental, swiping contact the Marberger unit received from the Nivens unit, or 2) the frontal impact the Marberger unit sustained when it rear-ended the Miller unit? To that end, Defendants requested Mr. Boggess perform a biomechanical analysis of the mechanisms and forces applied to the Marberger unit, *see* Boggess Report, Dkt. No. 79-4, at pp. 29-31, and requested Dr. Watson review the collision from the perspective of a trauma surgeon, *see* Watson Report, Dkt. No. 79-1, at pp. 2-3. Dr. Watson's opinions coupled with Mr. Boggess's opinions in this area lead to the defense position that all of Plaintiff's complained-of injuries were the result of his vehicle colliding with the rear of the Miller unit, and do not stem from the incidental swipe contact from the Nivens unit.

## STANDARD OF REVIEW

Federal Rule of Evidence 702 creates a "gatekeeping requirement" for the trial court to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526

---

[1] Plaintiff's deposition version of the collision makes no sense, and not even Plaintiff's own accident reconstruction expert Carter Chapman endorses Plaintiff's version. *Compare* Chapman Report, at p. 3 (Chapman's summary of Plaintiff's deposition version of collision), *with* Chapman Report, at p. 5 (explaining Chapman's own conclusions about how the collision occurred) (Chapman report attached hereto as **Exhibit B**). Defendants assume that Plaintiff will use Chapman's version at trial.

2

U.S. 137, 152 (1999). Rule 702 expressly states that a witness "may be qualified as an expert by knowledge, skill, experience, training, or education." Rule 702, FRE. Because Rule 702 "uses the disjunctive, a person may qualify to render expert testimony in any of the five ways listed," and the court may only exclude the witness as unqualified if they possess none of these five grounds. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *see also Friendship Heights Assoc. v. Vlatismil Koubek, A.I.A.*, 785 F.2d 1154, 1159 (4th Cir. 1986). Pursuant to Rule 702, a witness may be qualified as an expert to provide opinion testimony when:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702, FRE. The purpose of this rule is to ensure "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" is presented in the courtroom. *Kumho*, 526 U.S. at 152.

When making determinations on the admissibility of an expert's testimony, the Court may consider the Supreme Court's following set of non-exclusive factors, commonly referred to as the *Daubert* factors:

> 1) "whether [the] theory or technique . . . can be (and has been) tested"; 2) "whether the theory or technique has been subjected to peer review and publication"; 3) "the known or potential rate of error" of a methodology and "the existence and maintenance of standards of controlling the technique's operation"; and 4) the general acceptance of the theory within the "relevant scientific community."

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-94 (1993). No single factor is determinative; the "inquiry is a 'flexible one," providing a trial court with "broad discretion in

choosing which *Daubert* factors to apply and how to consider them." *Belville v. Ford Motor Co.*, 919 F.3d 224, 233 (4th Cir. 2019).

The Court's task is to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The relevance inquiry requires an analysis of whether the expert opinions have "a valid scientific connection to the pertinent inquiry." *Belville*, 919 F.3d at 232. And, to be reliable, "expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).

## ARGUMENT

### I.     Christopher Watson, M.D. is qualified as an expert, and his opinions are relevant and reliable pursuant to the *Daubert* standard.

As initial matter, Defendants note that Plaintiff did not take the deposition of Dr. Christopher Watson, instead abruptly canceling it on the morning he was scheduled to testify. *See* email, attached hereto as **Exhibit A**. Second, the motion as to Dr. Watson must be denied as he is unquestionably qualified to give his opinions in this case. As noted in his report: Dr. Watson has been licensed in South Carolina since 2003. Since 2008, Dr. Watson has been board certified by the American Board of Surgery in General Surgery and since 2010, he has been certified in Surgical Critical Care. Dr. Watson has been employed as a full-time Trauma Surgeon since 2007 and has an academic appointment as Associate Professor of Clinical Surgery at the University of South Carolina School of Medicine. Dr. Watson has been actively engaged in the practice of trauma surgery since 2001 at Prisma Health Richland (formerly known as Palmetto Health Richland/Richland Memorial Hospital), the busiest Level 1 Trauma Center in the State of South Carolina. Dr. Watson has evaluated and treated many thousands of blunt traumatic injuries,

4

including those of motor vehicle collisions, during this time. As a necessary part of this evaluation, Dr. Watson compares the specific mechanism of injury with the specific injury patterns sustained by the patient, including when the Emergency Medical Technicians (EMTs) bring him pictures of a particular crash(es).

There is nothing unreliable about Dr. Watson's opinions. After performing a thorough examination of at least 14 documents, including reports from the scene of the accident, medical records, and photos, Dr. Watson detailed his observations and opinions in a written report. (See Exhibits to Plaintiff's Motion, Doc. 79-1 and 79-2.) Therein, Dr. Watson's opinions are supported by his experience, medical standards, and his review of the case documents. As noted on his *curriculum vitae*, Dr. Watson has published numerous articles and has presented on issues germane to this claim. Dr. Watson is qualified in all five ways mentioned in Rule 702, FRE.

Dr. Watson's opinions are firmly supported by his analysis of Plaintiff's alleged injuries and grow naturally and directly out of the extensive research and experience as a trauma surgeon he received independent of this litigation. As such, they are reliable. Dr. Watson's opinions are sufficiently tied to the facts of this case and will aid the jury in resolving a factual dispute. Plaintiff had the opportunity to question Dr. Watson on his opinions and to evaluate his methodology during his deposition but chose not to after initially noticing Dr. Watson's deposition. Dr. Watson was ready to offer a detailed explanation of his methods and how he reached his conclusions during his deposition testimony.

In his testimony Dr. Watson could also explain how he reviews medical records, labs, and patients daily who may be under the influence of drugs. Plaintiff's assertion that the urinalysis referenced was two weeks post motor vehicle collision is simply not true. As seen in the McLeod

Health Clarendon records produced in this case, Plaintiff was positive for delta-9-tetrahydrocannabinol, or THC, on the day of the accident:

| 09/09/2021 14:25 EDT | U Amph Scrn | Negative |
| | U Barb Scrn | Negative |
| | U Benzodia Scrn | Negative |
| | **U Cannab Scrn** | **Positive** |
| | U Cocaine Scrn | Negative |

Plaintiff may now test Dr. Watson's methodology on cross-examination and by presenting contrary evidence at trial, if any.  Further, any proposed limitation as to Dr. Watson's expected testimony could be evaluated at the motion *in limine* stage or at trial, as Plaintiff—by his own choosing—did not explore Dr. Watson's testimony at deposition.

## II.     Brian Boggess, P.E. is qualified as an expert, and his opinions are relevant and reliable pursuant to the *Daubert* standard.

Plaintiff's Motion to Exclude Mr. Boggess grossly mischaracterizes Mr. Boggess's *role* in this case.  Mr. Boggess—who is, *inter alia*, an accident reconstruction engineer—was designated by Defendants in *response* to Plaintiff's designation of an expert in the same field, Carter Chapman, P.E.  (*Compare* Pls.' Am. Expert Witness Disclosure, Dkt. No. 59, *with* Defs.' Expert Witness Disclosure, Dkt. No. 74.)  Plaintiff's failure to recognize Mr. Boggess's role as a *rebuttal* expert has led to Plaintiff's Motion to Exclude being full of abject hypocrisy.  For instance, Plaintiff criticizes Mr. Boggess for "mirror[ing] the content of the [police] report" and "discuss[ing] his review of further deposition testimony, discussion between investigating officers, and dashcam video of the crash investigation."  Pls.' Mot. Exclude, Dkt. No. 79, at p. 7.  Plaintiff ignores the fact that Carter Chapman considered the exact same evidence.  *See* Chapman Report, Ex. B, at p. 1 (discussing police report); *id.*, at p. 3 (discussing the then-existing deposition testimony), *id.*, at pp. 2-3 (discussing the officers' dashcam video and the officers' conversations).  Plaintiff criticizes Mr. Boggess for focusing on the "sequence of the collisions between the three

vehicles," claiming that it is simply an "evaluation of the weight of the evidence."[2]  Pls." Mot. Exclude, Dkt. No. 79, at p. 6.  Again, Plaintiff ignores the fact that Carter Chapman reviewed much the same evidence and issued an opinion on the sequence of the collisions.  *See* Chapman Report, Ex. B, at p. 5 "Conclusions" ("The white Peterbilt [Nivens] was traveling approximately 30 mph at the time it rear-ended the gold Chevrolet [Marberger] which propelled the gold Chevrolet into the rear of the green International [Miller].").  In short, Plaintiff is wrong to overlook Mr. Boggess's role as a rebuttal expert, and that omission has infected the entirety of Plaintiff's Motion to Exclude with hypocrisy and logical fallacies.

Plaintiff's Motion to Exclude also grossly mischaracterizes *how* Mr. Boggess arrived at his opinions in this case.  Plaintiff claims Mr. Boggess's opinions "invade[] the province of the jury and fail[] to consider all relevant data."  Pls.' Mot. Exclude, Dkt. No. 79, at p. 6.  The gist of Plaintiff's contention is that Mr. Boggess simply came up with a sequence of events by "provid[ing] circular testimony which assumes his final opinion in the methodology for arriving at this opinion."  (*Id.*, at p. 7.)  First, Plaintiff never sent a subpoena to Mr. Boggess for his file materials, so Plaintiff essentially has filed this Motion without even looking at Mr. Boggess's calculations.  Second, Plaintiff—by his own choosing—engaged in bare-bones questioning of Mr. Boggess at deposition.  *See* Ex. D, *infra*.  Third, Plaintiff's Motion ignores Mr. Boggess's very clear testimony about how he arrived at the conclusion that the Marberger unit hit the Miller unit before the Marberger unit was swiped by the Nivens unit:

---

[2] Notably, sometimes the evidence does weigh heavily in favor of one party over another.

| | |
|---|---|
| 9     The contact between those vehicles, the<br>10  damage between those two vehicles, do not support<br>11  a speed change that would accelerate the Chevrolet<br>12  up to a speed that would provide enough energy to<br>13  cause the frontal damage. | |

(Dep. of B. Boggess, Excerpts at Dkt. No. 79-3, at p. 17 ll. 9-13 (full version attached hereto as **Exhibit D**).)  In other words, Mr. Boggess's objective scientific-based accident reconstruction establishes that the damage to the front and left of the Nivens unit, *see* Fig. 1 below, matched to the damage to the right and rear of the Marberger unit, *see* Fig. 2 below, does not support an impact forceful enough to transfer sufficient energy into the Marberger unit to propel it into the Miller unit and cause the measurable damage that occurred to the front of the Marberger unit, *see* Fig. 3 below.



Fig. 1 – Damage to Left and Front of Nivens Unit (from B. Boggess Report, Dkt. No. 79-4, at p. 24) (ovals added)



Fig. 2 – Damage to Right and Rear of Marberger Unit (from B. Boggess Report, Dkt. No. 79-4, at p. 19) (oval added)



Fig. 3 – Damage to front of Marberger Unit (from B. Boggess Report, Dkt. No. 79-4, at p. 18).

Therefore, Mr. Boggess reasonably concluded that the Marberger unit first collided with the rear of the Miller unit. As he put in his report and discussed in his deposition, this conclusion stems from his reconstruction, which applied published, peer-reviewed accident reconstruction methodologies applying the analyses of barrier-equivalent velocity (BEV), conservation of

momentum, and force balance.  The first step, described beginning at page 17 of Mr. Boggess'

report, involved his team[3] taking detailed measurements of the Marberger unit to obtain its current

dimensions, and comparing those dimensions with as-manufactured measurements to determine

the various areas of crush on the Marberger unit.  Boggess Report, Dkt. No. 79-4, at pp. 17-22.

Next, as discussed on p. 26 of the report, Mr. Boggess used vehicle stiffness data obtained from

crash testing to calculate the BEV[4] and associated impact forces that would have caused the

various areas of crush.  *Id.*, at p. 26.  Then, Mr. Boggess used conservation of momentum and force

balance  methodologies  to  establish  that  the  frontal  damage  to  the  Marberger  unit  required

significantly more force than that which was applied to it by the Nivens unit, therefore establishing

that Marberger's own excess speed sent the Marberger unit into the back of the Miller unit first:

"**the hypothesis that the [Marberger unit] struck the [Miller unit] first, followed by the**

**[Niven's unit's] secondary contact, is feasible…**"  *Id.*, at p. 29 (emphasis in original); *see also*

*id.*, at p. 26 ("**the energy associated with the frontal crush of the [Marberger unit] to the**

**[Miller unit] significantly exceeded that evident within the sideswipe engagement(s) between**

**the [Nivens unit] and the [Marberger unit].**").

---

[3] Plaintiff criticizes Mr. Boggess, an employee of SEA, Ltd., for relying on measurements taken
by another SEA employee who measured the Marberger unit.  (Pls.' Mot. Exclude, Dkt. No. 79,
at p. 7 ("Boggess did not form his opinion by independently evaluating the physical evidence, but
by reviewing the measurements of another…").)  This argument is specious.  Every day, people—
including experts—work as part of teams.  It is standard practice for a lead engineer to have other
engineers or consultants working under him. *See* Boggess CV, Ex. C, at p. 1 (Boggess is a
Discipline Lead at SEA, Ltd.).

[4] Barrier equivalent velocity, or BEV, is a "physical term in reconstruction whereby its intent is to
'quantify the energy required to cause the damage associated with an impact' defined as '…the
speed with which the vehicle would have to strike a rigid barrier in order for it to absorb the same
amount of crush energy as it did in the actual impact.'"  Boggess Report, Dkt. No. 79-4, at p. 26
(citation omitted).

As noted above, Plaintiff claims Mr. Boggess's methodology is merely a re-hash of the police report and a recap of his review of law enforcement's conversations. However, as noted in his report, Mr. Boggess considered witness testimony, videos, photos, measurements, and many other pieces of available data. Boggess Report, Dkt. No. 79-4, at pp. 8-9. Mr. Boggess is not reliant upon any one piece of evidence but rather has considered each piece of available data as any expert should. He then applied all this data to the crush profile-BEV-conservation of momentum/force balance process detailed in the preceding paragraph and *as described by the peer-reviewed and published sources listed by Mr. Boggess in his report:*

> 3. Peer-reviewed and published literature was reviewed in support of the subject analysis. Examples of this literature include, but are not limited to:
>
> - Cheng, P., Tanner, C. B., Chen, H., Durisek, N., & Guenther, D. (2005). *Delta-V, Barrier Equivalent Velocity and Acceleration Pulse of a Vehicle During an Impact* (Technical Paper No. 2005-01-1187). SAE. https://doi.org/10.4271/2005-01-1187.
> - Fricke, L.B. (1990). *Traffic Accident Reconstruction*, The Traffic Accident Investigation Manual, Volume 2. Evanston: Northwestern University Traffic Institute.
> - Fricke, L.B. (2010). *Traffic Accident Reconstruction*, The Traffic Accident Investigation Manual, Volume 2. Evanston: Northwestern University Traffic Institute.
> - Wiechel, JF, Morr, DR, & Boggess, BM. (2010). Application of the Scientific Method to the Analyses in Forensic Science With Case Example. *Proceedings of the ASME 2010 International Mechanical Engineering Congress and Exposition. Volume 11: New Developments in Simulation Methods and Software for Engineering Applications; Safety Engineering, Risk Analysis and Reliability Methods; Transportation Systems,* (Paper No. 2010-39044), pp. 515-522. ASME. https://doi.org/10.1115/IMECE2010-39044

Boggess Report, Dkt. No. 79-4, at p. 9. In plain terms, Mr. Boggess applied standard accident reconstruction principles to the available data and reached reasonable and reliable conclusions.

Finally, Plaintiff's Motion ignores Mr. Boggess's *professional standing*. Plaintiff neglects to include the *curriculum vitae* and testimony list of Mr. Boggess, both of which were appendices

to Mr. Boggess's report.[5]  *See* Boggess Report, Dkt. No. 79-4, at p. 33 (list of Appendices); *see also* Brian Boggess CV plus testimony list, attached hereto as **Exhibit C**.  However, one look at Mr. Boggess's credentials reveals that he is eminently qualified.  Mr. Boggess holds a bachelor's in mechanical engineering and a master's in mechanical and aerospace engineering (specializing in automobile safety and biomechanics).  Brian Boggess CV plus testimony list, Ex. C, at p. 1.  Mr. Boggess is a licensed engineer in over 30 states.  *Id.*, at p. 3.  Mr. Boggess holds seven patents related to vehicle safety devices.  *Id.*, at p. 6.  Mr. Boggess has been published repeatedly in the accident reconstruction/biomechanics industry, with a research and writing career spanning over 20 years.  *Id.*, at pp. 6-10.  Mr. Boggess has worked in university-based and industry-based laboratories working on biomechanics and automobile safety.  *Id.*, at p. 2.  Mr. Boggess has worked for SEA, Ltd. performing accident reconstructions and biomechanical analyses since 2007.  *Id.*, at p. 1.  According to his testimony list, since January of 2021, Mr. Boggess has testified at deposition over 80 times and at trial over 20 times.  *Id.*, at pp. 11-22.  As detailed herein, Mr. Boggess applied these credentials and this experience to perform his work in this case.  Plaintiff is wrong to attempt to sweep away Mr. Boggess's well-grounded testimony.

## <u>CONCLUSION</u>

"A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Rule 702, FRE, Advisory Committee's Notes.  In this case, Plaintiff's Motion must be denied as to both Dr. Watson and Mr. Boggess.

*Signature block on following page.*

---

[5] Boggess's report was filed by Plaintiff as an exhibit to the Motion, but the appendices were left out.

Respectfully submitted,

Sweeny, Wingate & Barrow, P.A.

s/ Aaron J. Hayes
Aaron J. Hayes, Fed. I.D. No. 11196
Post Office Box 12129
Columbia, SC 29211
(803) 256-2233
ATTORNEYS FOR NIVENS

McAngus Goudelock and Courie

s/ Adam Ribock
Adam Ribock, Fed, I.D. No. 12287
1320 Main Street, 10th Fl.
Columbia, SC 29201
(803) 779-2300
ATTORNEYS FOR DZYK

Columbia, South Carolina

March 28, 2025