

3200 Devine Street, Suite 103
Columbia, South Carolina 29205
info@garberreporting.com
Telephone: (803) 256-4500

## BRIAN M. BOGGESS, MS, PE

*February 27, 2025*

## Robert Marberger

vs

## Jeremy R. Nivens, et al

## 3:22-cv-02375-MGL

REPORTER: Cassandra Vance

```
 1              IN THE UNITED STATES DISTRICT COURT
                  DISTRICT OF SOUTH CAROLINA
 2                     COLUMBIA DIVISION

 3                         CASE NO.:  3:22-cv-02375-MGL

 4   Robert Marberger,              )
                                    )
 5            Plaintiff,            )
                                    )
 6        vs.                       )
                                    )
 7   Jeremy R. Nivens and DZYK      )
     Transportation Services, LLC,  )
 8                                  )
              Defendants.           )
 9                                  )

10           VIDEOCONFERENCE DEPOSITION OF

11           BRIAN M. BOGGESS, M.S., P.E.

12                   ********

13           Thursday, February 27, 2025

14              3:00 p.m. - 3:35 p.m.

15        The deposition of BRIAN M. BOGGESS,

16   M.S., P.E., was taken on behalf of the

17   Plaintiff via videoconferencing on the 27th

18   day of February, 2025, before Cassandra E.

19   Vance, Court Reporter and Notary Public in

20   and for the State of South Carolina, pursuant

21   to Notice of Deposition and agreement of

22   counsel.

23

24

25
```

```
 1                      APPEARANCES:

 2   Lauren Heath Carroway, Esquire
     Morgan & Morgan, P.A.
 3   1544 Fording Island Road, Suite A
     Hilton Head, South Carolina  29926
 4   Counsel for the Plaintiff

 5   C. Guy Castles, IV, Esquire
     McAngus Goudelock & Courie, LLC
 6   Meridian Building, 10th Floor
     1320 Main Street
 7   Columbia, South Carolina  29201
     Counsel for Defendant DZYK Transportation Services, LLC
 8
     Mark V. Gende, Esquire
 9   Sweeny, Wingate & Barrow, PA
     1515 Lady Street
10   Columbia, South Carolina  29201
     Counsel for Defendant Jeremy R. Nivens
11
                         INDEX
12                                          PAGE

13   Direct Examination by Ms. Carroway..........3
     Stipulations................................2
14   Certificate................................28
     Verification of Deponent...................29
15   Errata Page................................30

16                       EXHIBITS

17   (There were no exhibits marked during the deposition.)

18                     STIPULATIONS

19        It is stipulated and agreed that this

20      deposition is being taken pursuant to the

21      South Carolina Rules of Civil Procedure.

22        It is stipulated by and between counsel

23      and the witness that the reading and signing

24      of the following deposition be, and the same

25      are, hereby reserved.
```

Garber Reporting
info@garberreporting.com

BRIAN M. BOGGESS, MS, PE

```
 1        BRIAN M. BOGGESS, M.S., P.E., having
 2   been duly sworn, deposes and testifies as
 3   follows:
 4                DIRECT EXAMINATION
 5   BY MS. CARROWAY:
 6   Q    Good afternoon, Mr. Boggess.  My name --
 7        MR. CASTLES:  You know what I'm going to
 8   cut you off and say.
 9        MS. CARROWAY:  Oh, yeah.
10        MR. CASTLES:  Can we do an objection for
11   one is an objection for all?
12        MS. CARROWAY:  Yes.
13        MR. CASTLES:  Okay.
14   BY MS. CARROWAY:
15   Q    My name is Lauren Carroway and I represent
16   the Plaintiff in this matter.  I am going to take
17   your deposition this afternoon.  Have you had your
18   deposition taken before?
19   A    Yes, ma'am.
20   Q    Okay.  I'm going to skip over all the hoopla
21   since you're somewhat used to it.  Can you state
22   your full name for the record?
23   A    Sure, Brian Michael Boggess.
24   Q    Okay.  And, Mr. Boggess, what's your
25   professional address?
```

BRIAN M. BOGGESS, MS, PE

1   A    3139 Westinghouse Boulevard, Charlotte, North

2   Carolina, 28273, and the company's SEA Limited.

**3   Q    Okay.  And who retained you in this case?**

4   A    Mr. Hayes first reached out to discuss it,

5   and then I understand it was a -- kind of a joint

6   retention between him and counsel -- actually, I

7   think he first said Adam Ribock, but MGC.

**8   Q    Okay.  And how many depositions have you**

**9   given?**

10  A    I don't know an exact count.  A lot.  You

11  know, I'd say more than a hundred over my career.

**12  Q    Okay.  How about testifying in trials?  Do**

**13  you know how often you've testified in a trial?**

14  A    Again, several.  I think, again, over my

15  career, more than 40 or 50 at this point.

**16  Q    Okay.  And what are your qualifications?**

17  A    Undergraduate degree in mechanical

18  engineering, master's of science in mechanical and

19  aerospace, specializing in automotive safety and

20  biomechanics.

21       Work experience-wise, design and crash-tested

22  cars at Honda for -- between six and seven years.

23  And I've worked as a licensed professional

24  engineer since 2006, I believe is when I first got

25  licensed.  And, again, specialized training in

BRIAN M. BOGGESS, MS, PE

1    reconstruction, biomechanics, and continuing

2    ongoing education.

3    **Q    Okay.  Do you hold any specific**

4    **certifications?**

5    A    Licensure is professional engineer, but I'm

6    not -- I can't think of any other certifications

7    that would be applicable.

8    **Q    And what were you retained to do for the**

9    **Defense?**

10    A    Generally speaking, essentially to review

11    available materials, provided materials, conduct a

12    reconstruction and biomechanics analysis to the

13    extent possible given the evidence.

14    **Q    So, have you been able to complete that**

15    **analysis at this point?**

16    A    I mean, I've completed what I have available

17    to me at this point, yes ma'am.

18    **Q    So are you prepared to give me your final**

19    **opinions about the case?**

20    A    I certainly can give you my opinions today.

21    I mean, as I understand, you know, there's been

22    depositions as recently as Monday of Mr. Miller.

23    I understand Mr. Chapman, I think, was deposed

24    over the last couple hours, even, so.  But,

25    certainly, I can provide the opinions based on the

1   materials I have and my, you know, understanding

2   of things at this point.

3   **Q    Okay.  And tell me what -- what were those**

4   **materials that you used to reach your opinion?**

5   A    Sure.  So, I was provided a couple traffic

6   collision reports, South Carolina collision

7   reports, two different ones; incident report from

8   Cowan Systems; again, just various discovery

9   documents.

10        Repair estimates for the Cowan vehicle;

11   photographs from the scene; video, dash camera

12   footage from the scene, from both -- I think they

13   came from SCDPS, as well as the Sumter County

14   Sheriff's Office.  I believe there was two

15   different folders labeled for that.

16        I received the report of Mr. Chapman and his

17   associated file materials; a couple deposition

18   transcripts, that being Mr. Marberger and

19   Mr. Nivens; some medical records of Mr. Marberger.

20   I think that summarized what I was provided at

21   this point.

22   **Q    Okay.  And have you personally reviewed all**

23   **of these documents?**

24   A    I have.

25   **Q    Who provided them to you?**

BRIAN M. BOGGESS, MS, PE

```
 1   A    I believe they came directly from Mr. Hayes's
 2   office.
 3   Q    And do you know when they were provided to
 4   you?
 5   A    I don't know the exact date.  I mean, it was
 6   late '24, somewhere in the 2024 -- you know.  I
 7   don't know if that was December, November.  I
 8   could probably look it up, but...
 9   Q    Have you requested any additional materials
10   from Mr. Hayes or Mr. Castles' office that have
11   not been provided to you?
12   A    I guess, you know, typically, I would ask:
13   Are these all the photographs?  Are there anything
14   else?  I mean, I -- you know, I think I've asked
15   for, you know, again, just generally, "What do you
16   have and please provide it."  There's nothing
17   specific that I've said, "Can I have," and they've
18   denied me having or something like that.
19   Q    Are there things that you do not have in this
20   case that you wish you had?
21   A    I mean, there's always things you -- you
22   know, you'd like to have.  You'd like to have more
23   photographs.  You'd like -- you know, there's --
24   within the body cam footage, someone's discussing
25   a video that I know Mr. Chapman and I both have
```

BRIAN M. BOGGESS, MS, PE

```
1   referenced the discussion of.  So, you know, if

2   that's out there, I'd love to have that.

3        But, again, I think I -- for the opinions I'm

4   offering, I think I have enough, or I do have

5   enough to offer the opinions I'm offering.

6   Q    Okay.  Did you physically instruct Mr. --

7   inspect, I apologize, Mr. Nivens' truck?

8   A    I did not, no.

9   Q    Did you personally inspect Mr. Marberger's

10  truck?

11  A    I did not.

12  Q    Okay.  Did you go to the accident scene in

13  Sumter County?

14  A    I have not at this point, no, ma'am.

15  Q    Did you personally take any measurements?

16  A    I did not.

17  Q    Did you speak with Mr. Nivens, the Defendant

18  in this case?

19  A    I have not.  Read his deposition, but I have

20  not spoken directly to him.

21  Q    Okay.  What -- what about Mr. Miller, the

22  truck driver driving the truck first in line, did

23  you speak with him?

24  A    I have not, no, ma'am.

25  Q    Did you speak with any of the investigating
```

BRIAN M. BOGGESS, MS, PE

1  officers?

2  A    I have not at this point, no, ma'am.

3  Q    You would agree that you could have

4  interviewed any of these individuals, correct?

5  A    I mean, if they're available and willing to

6  speak, sure, I suppose I could.

7  Q    Okay.  Did you calculate the speeds of the

8  vehicles?

9  A    I calculated things like barrier equivalent

10  velocity for certain areas of damage and made

11  certain calculations from that.

12    The speeds of the vehicles, in general, we

13  don't have enough information to make absolute

14  travel speed calculations for those vehicles.

15  Q    Okay.  Did you calculate the point of impact

16  for the vehicles?

17  A    Wouldn't say necessarily it's a calculation.

18  I mean, I've made assessments of -- of where the

19  points of impact were or various points of impact

20  were throughout the sequence of events.

21  Q    Were you able to review any ECM data for any

22  of the vehicles?

23  A    No, ma'am.

24  Q    What about an engine download?

25  A    No, ma'am.  The -- not been provided anything

BRIAN M. BOGGESS, MS, PE

1  from either truck, either -- I should say -- not

2  to confuse things, there's three trucks, depending

3  on how you want to define it.

4       The -- I have not seen engine ECM-type data

5  from either the International or the Peterbilt,

6  and the Chevrolet did not have a module that was

7  imageable.

8  **Q     Okay.  What information that has been**

9  **provided to you do you feel is significant?**

10  A     I mean, I don't really know how to rate it as

11  significant or not.  I took it all into account.

12  I mean, the pictures that were provided from the

13  scene, the dash camera from the scene to show

14  where vehicles were, and same thing with the

15  photographs, where the contact areas are, the

16  inspection photographs of the Chevrolet that my

17  office was able to capture, as well as the

18  photographs taken by Mr. Chapman of the same

19  vehicle, again, I used all that.

20       I mean, all that factors into how the

21  vehicles got together, the magnitude of things,

22  the measurements that we captured of the damage to

23  the Chevrolet that we were able to use and

24  articulate into our calculations of crush energy,

25  things like that.  I mean, all that's important.

BRIAN M. BOGGESS, MS, PE

```
1          The testimony is important.  The statements
2     that we -- at least that I have to date are
3     important, so.
4     Q    And you mentioned earlier repair estimates.
5     How much were the repair estimates?
6     A    I don't recall the number.  I think it was
7     for the Cowan vehicle.  I don't remember the
8     number.  I'd have to go back and look it up.
9     Q    Can you tell me what the damage was to each
10    of the vehicles?
11    A    I mean, generally speaking, there's certain
12    areas, things that we can walk through, yes,
13    ma'am.
14    Q    Okay.  Well, let's start -- let's start with
15    the Defendant's vehicle, the Defendant's
16    tractor-trailer.
17    A    Okay.  I mean, what's evident to -- in the
18    damage is, I mean, there's -- there's gouging
19    marks on the side of the sleeper berth and the
20    body of the cab.  There's -- appears to be some
21    contact up around the front left headlight
22    extreme.  Those are the most evident areas of
23    contact.
24    Q    Was there any other damage noted?
25    A    I don't recall at this point.
```

BRIAN M. BOGGESS, MS, PE

1  Q    What about the Plaintiff's pickup truck?

2  A    I mean, there's -- clearly, there's evident

3  damage to the right rear axles.  At least spring,

4  the suspension, if you will, definitely has damage

5  to it.  I mean, the tire's still inflated, but if

6  it took that kind of load, I'm sure the -- you

7  know, there's -- I wouldn't want to reuse that

8  tire, but it did not get cut down, necessarily.

9       The flatbed is slightly out of alignment, but

10  appears to still be intact, but there is some

11  slight malalignment of that.

12      The driver's -- or, sorry, the passenger side

13  cab body, there's some -- you know, there's damage

14  to the door panels of that.

15      And then there's heavy frontal damage, hood,

16  bumper, reasonably the radiator, you know, frame

17  ends, things like that, given the magnitude of

18  that damage and all the, you know, underlying

19  engine room damage that would be associated with

20  all of that frontal crush.

21  Q    And what about damage to Mr. Miller's

22  tractor-trailer?

23  A    I mean, the visible is clearly the trailer

24  right side, rear part of the trailer.  The ICC

25  bar, you know, that structure of it is clearly

BRIAN M. BOGGESS, MS, PE

1   damaged, pushed forward.

2   Q     What -- what references did you use in

3   creating your report?

4   A     You know, I mean, I obviously would be

5   considering, utilizing several studies that kind

6   of support fundamental reconstruction.

7         I did make reference to a few in my report,

8   specifically the "Traffic Accident Reconstruction"

9   textbooks published by Northwestern University;

10  author is Fricke in those.

11        The -- there's an SAE paper I make reference

12  to about Delta-V barrier equivalent velocity and

13  accelerations, and it related to vehicle crashes,

14  made reference to that, as well, specifically in

15  my report.

16  Q     And do you believe that -- like the SAE

17  Delta-V, are these authoritative materials?

18  A     I wouldn't call -- no, ma'am, I wouldn't call

19  them authoritative.  I mean, they're

20  reconstruction studies, text, you know, going

21  through some fundamental physics.  They provide

22  some good information.  I certainly wouldn't call

23  them authoritative, though.

24  Q     Okay.  And how did you choose -- choose that

25  to rely on?

BRIAN M. BOGGESS, MS, PE

Page 14

```
1   A    I mean, the -- the SAE paper is
2   peer-reviewed, published.  You know, it's a good
3   paper.  It provides good definitions, terminology
4   of fundamental:  What is Delta-V?  What is barrier
5   equivalent velocity?  How are they interrelated?
6   Basic analyses.  It's a good study.
7        The Fricke -- the Fricke author, "Traffic
8   Accident Reconstruction" textbooks are -- you
9   know, they're the textbook utilized in the
10  Northwestern Traffic Institute when they teach
11  accident reconstruction.
12       They are good information.  There's some good
13  information in there, fundamental analysis,
14  discussion, case examples.  And so, again, they're
15  good -- you know, they're good text.  You know,
16  they're not perfect.  There's -- I take issue with
17  certain things within those texts.
18  Q    Okay.  Let's talk about, what is your
19  specific opinion as to how this crash occurred?
20  A    So, I lay out in my report that there's
21  basically kind of four, you know, postulated, you
22  know, hypotheses, and I've kind of tried to rule
23  out what I could.
24       So, you know, as I said in my report, I don't
25  believe -- it's my opinion that it did not occur
```

BRIAN M. BOGGESS, MS, PE

Page 15

1    in the way Mr. Marberger has testified; that is

2    that he was in the left lane, he got merged into,

3    effectively, pushed into a wall that doesn't

4    exist, and, you know, my report kind of walks

5    through that.

6         You know, there's -- clearly, there's two

7    primary events.  There is a -- best I can tell,

8    there is the Chevrolet, your client's vehicle,

9    making frontal contact to the rear of the Miller

10   vehicle, the International trailer -- or the

11   trailer in tow by the International, rather --

12   that has certain parameters there.

13        And then there is a -- there's a separate

14   kind of corner sideswipe, if you will, of the

15   Peterbilt as it moves up along the side, around

16   the right side of the Chevrolet.  So, those --

17   there's two very distinct different contact marks.

18        Based upon the reconstruction, the -- it is

19   more probable that the Chevrolet ran into the back

20   of the International first, and that that

21   collision -- and we can talk about the severity of

22   it, perhaps, but -- and then the secondary, lesser

23   degree sideswipe, corner swipe by the Peterbilt

24   relative to the right rear corner, right side of

25   the Chevrolet.

BRIAN M. BOGGESS, MS, PE

Page 16

1  Q    Okay.  And what -- you said you believe it's

2  more probable that -- that the Chevrolet ran into

3  Miller's rear and then there was a corner swipe of

4  the Chevy.  What did you base that on?

5  A    A couple things.  I mean, based on the

6  positioning of the vehicles, the severity of the

7  different collisions...

8       You know, I think one of the things, perhaps,

9  Mr. Chapman and I would agree on is that the --

10 the BEV of the Chevrolet to the back of the

11 International's trailer is in that 15- to

12 20-mile-an-hour range.

13      He came up with some, I think, around 16,

14 maybe some higher.  My calculations in my packet

15 are going to be around 18 plus.  But, again, a --

16 you know, that type of range BEV.

17      But that would be consistent with a notably

18 higher striking speed in order to create that BEV

19 because you're going to get a shared energy

20 distribution or what's called "work energy" or

21 "crush energy" associated with the damage to both

22 vehicles and the resulting Delta-V's to both

23 vehicles associated with that.

24      That -- the contact between the Peterbilt --

25 and, actually, if I just back up for a second.

BRIAN M. BOGGESS, MS, PE

1    You know, Mr. Chapman, for example, says that he

2    believes that, you know, it would take a 25 -- you

3    know, around 30 -- I think he said 25 to 35 was

4    his calculations -- around a 30 mile-an-hour

5    transfer of speed between -- to the Chevrolet by

6    the Peterbilt's propellant to the -- to the extent

7    by which it strikes the back of the leading

8    International.

9        The contact between those vehicles, the

10   damage between those two vehicles, do not support

11   a speed change that would accelerate the Chevrolet

12   up to a speed that would provide enough energy to

13   cause the frontal damage.

14       So, when you analyze the magnitude of the

15   interaction between those two vehicles, yes,

16   there's a few miles an hour of BEV, if you will,

17   of damage energy to them, but those two vehicles

18   never reach common velocity.

19       It is a swiping contact, so you're not

20   getting a full vehicle-to-vehicle engagement.  It

21   is, again, coming around the right side of the

22   Chevrolet, down the left side of the Peterbilt.

23   But, again, that transfer of energy does not

24   explain the magnitude of energy available within

25   the Chevrolet to then deliver the magnitude of the

BRIAN M. BOGGESS, MS, PE

Page 18

1    frontal collision that we see.

2        You know, the -- for what it's worth, as you

3    listen to the audio of the officer, he -- you

4    know, he's talking about the Chevrolet striking

5    the back of the International and then the

6    Peterbilt making a secondary -- the secondary

7    contact.

8        I understand Miller -- Mr. Miller's testimony

9    believes that that to be the same, and even in his

10    written statement, his statement seems to imply

11    that same sequence of events, as well.

12        So I think there's several variable -- or

13    pieces that support that, aside from just a pure

14    reconstruction of the physical evidence.

15    **Q    Well, and you -- you referenced the officer's**

16    **dash cam or body cam, I apologize.  You would**

17    **agree with me, then, that they go back and forth**

18    **about what happened.  They're not clear.**

19    A    He -- it appears that the officer is -- is

20    writing two reports.  He's explaining why he's

21    going to write two reports because he -- he,

22    actually -- the way I listened to it, it sounds

23    like there was an earlier event where maybe the

24    Peterbilt kind of came up on and went around the

25    right side and then came back in behind.  They

BRIAN M. BOGGESS, MS, PE

1   progress up and a secondary event occurred.

2        So he -- he's -- I don't think he's waffling.

3   He's describing it and his -- it seems to be

4   pretty clear in my -- when I listened to it, at

5   least, that there -- this -- this event, the

6   primary event here is, the Chevrolet's traveling

7   along, it, you know, slams into the back of the

8   International, and then the Peterbilt goes to the

9   shoulder a second time -- actually, is what he's

10  describing it, the way I'm hearing it, at least --

11  that goes kind of around and, again, clips these

12  vehicles in that on-off-the-shoulder movement

13  secondary to the Chevrolet striking the back of

14  the International.

15  **Q    And you're -- are you referencing, there was**

16  **a discussion between two officers, a**

17  **back-and-forth discussion as to how this unfolded?**

18  A    Yes, it seemed like the one officer who's

19  writing the accident reports is explaining to

20  another officer who hadn't seen the video saying

21  what he saw in the video, why he's writing the

22  report, is my take of listening to that audio.

23  **Q    Okay.  But you would agree that there are**

24  **different opinions given as to how the accident**

25  **unfolded within that conversation?**

BRIAN M. BOGGESS, MS, PE

1  A    I don't know that necessarily there's two

2  different -- multiple opinions.  I think there is

3  an explanation, and the other officer keeps

4  asking, "What happened?  Explain to me.  I

5  didn't" -- you know, as if he didn't see the video

6  and -- and he keeps kind of going back through

7  the -- his recount of it.  But, I mean, the -- you

8  know, the audio will speak for itself, so.

9  **Q    Did you have any telephone conversations with**

10 **Mr. Hayes or anyone from his office regarding your**

11 **deposition today?**

12 A    I have, yes.

13 **Q    And how much time will be billed for that**

14 **conversation?**

15 A    I'm not sure.  We had a brief call yesterday

16 for, I don't know, I'd say more than 15 minutes,

17 less than an hour.  I don't know what the total

18 time was.

19 **Q    What about anybody -- Mr. Castles or anybody**

20 **from McAngus?**

21 A    Same.  It was kind of a shared call

22 yesterday.

23 **Q    Okay.  Have you been asked to testify in a**

24 **trial of this case?**

25 A    I mean, I assume since they've disclosed me

BRIAN M. BOGGESS, MS, PE

```
 1   that they would use me at trial.  I haven't -- I
 2   don't know that we've had a specific discussion
 3   about the trial yet, but...
 4   Q    Have you submitted any bills to them?
 5   A    That would come through our accounting.  I'm
 6   not sure if one's been released yet.  It may have
 7   been.  I'm not sure.
 8   Q    What is your hourly rate?
 9   A    SEA bills my time at 450.
10   Q    And is that how much you would charge to
11   testify at trial on their behalf?
12   A    Yes, ma'am.
13   Q    Do you charge travel expenses, as well?
14   A    SEA does charge travel time and expense, yes,
15   ma'am.
16   Q    Have you been hired by Sweeney, Wingate, and
17   Barrow before?
18   A    Yes, ma'am.
19   Q    How many times?
20   A    I don't know.
21   Q    Well, ballpark it.  More than ten?  Less than
22   ten?
23   A    I mean, I've been doing this 17 years.
24   They've -- I'm sure they've hired me more than ten
25   times over those years.
```

BRIAN M. BOGGESS, MS, PE

1   Q   **How many cases do you currently have with**

2   **them?**

3   A   A few.  I don't know if it's -- you know, I

4   don't know how many active there would be.  A few,

5   though.

6   Q   **Like, when you say a few, is that three or**

7   **13?**

8   A   I really don't know.  I mean, I don't -- I

9   don't, you know, add them up or -- I have a list.

10   I mean, cases in litigation, as you said, cases --

11   I mean, is it probably at least three?  I'm sure

12   it is.  I don't know if it's as many as you said,

13   13 or not.  I'm not sure.

14   Q   **But it could be?**

15   A   I won't say it's impossible.  You know,

16   there's a lot of cases that are -- you know, I

17   don't hear about for two years.  You know, they

18   sit open and I don't know if they're open or

19   closed, so.

20   Q   **I understand that for sure.  How about this,**

21   **do you know what percentage of work you do for the**

22   **plaintiffs versus the defense?**

23   A   I do both.  I mean, I'll work for whoever

24   calls and ask for an opinion.  I'll be happy to

25   give them a -- you know, an honest, objective

BRIAN M. BOGGESS, MS, PE

Page 23

```
 1   opinion.  But I would say I've estimated in the

 2   past that my work is probably somewhere in the

 3   80-20 split, defense and plaintiff.

 4   Q    With 80 percent being defense work?

 5   A    Yes, ma'am.

 6   Q    How many plaintiff's cases do you have right

 7   now?

 8   A    I mean, I have several.  I mean, I'm working

 9   on a report right now on one.  I was working on it

10   earlier today.  But I don't know how many to --

11   again, I don't have a master list of all my open

12   or maybe open cases.

13   Q    So, you don't know how many open accident

14   reconstruction cases you have total?

15   A    I do not, no, ma'am.

16   Q    Okay.  What percentage of your current

17   professional work would you say is spent in -- or

18   being a forensic expert for litigation cases?

19   A    I mean, cases in litigation is less than

20   50 percent.  I mean, a lot of what we do is, you

21   know, maybe even just accident response, providing

22   quick feedback.  You know, it could be an accident

23   that happened this morning.

24        And not that I'm -- I didn't get one today.

25   But just as an example, we may go out, provide
```

BRIAN M. BOGGESS, MS, PE

```
 1   some feedback to an attorney, an insurance
 2   carrier, you know, a personal entity.  You know,
 3   that happens all the time and there is no
 4   litigation, never is.  Just, maybe it's just
 5   evidence preservation.  So, those are -- that's a
 6   separate pocket.  And then I do non-litigation
 7   stuff, as well, just general consulting in the
 8   mechanical engineering, biomechanic realm.
 9   Q    So, just -- just so I'm clear that I
10   understand, you would say that pretty much a
11   hundred percent of your income is derived from
12   being -- from doing forensic expert work.  It's
13   just not all in litigation?
14   A    No, ma'am, I wouldn't say that.
15   Q    All right.  I misunderstood you.
16   A    No.  So, litigated -- litigated matters that
17   ever end up in litigation whatsoever, or even have
18   an attorney involved is -- I would say is less
19   than 50 percent of what my daily work tasks things
20   are.
21        I have, you know, consulting for various
22   parties.  You know, maybe just, you know,
23   documenting, preserving, answering questions.  I
24   do pre-market testing for clients, product -- help
25   with product development.
```

BRIAN M. BOGGESS, MS, PE

```
1        I have managerial roles, training roles
2   within the company, for which, you know, that's,
3   again, part of my job duties, as well, so.
4   Q    So, can you give me an estimate on what you
5   believe -- or what percentage of your income is
6   based on expert forensic work?
7   A    I can't.  I mean, again, I'm a fixed salary
8   employee, you know, so whether I end up doing one
9   hour this week of forensics or 50, it doesn't
10  change, so.  But, no, I don't -- there's not a
11  direct tie between one or the other.
12  Q    Okay.  Have you ever testified in a trial
13  involving Mr. Barrow's firm?
14  A    Yes.
15  Q    And when was that?
16  A    The last matter I believe I had with them was
17  last fall, perhaps.  I think, maybe last
18  October-November time frame.
19  Q    And where was that trial held?
20  A    It was pending in Anderson, South Carolina, I
21  believe.
22  Q    What about for McAngus?
23  A    Not sure.  Perhaps last summer?  I think -- I
24  believe I've had one for them in the last
25  12 months, but I'm not sure.
```

BRIAN M. BOGGESS, MS, PE

1    Q    Okay.  And do you know where that trial was
2    held?
3    A    If the one I'm thinking was for them, I
4    believe it was in Rock Hill, South Carolina, if
5    that was -- I can't remember if that was
6    definitely their firm or not, but it might have
7    been.
8    Q    When you have communicated with Mr. Hayes or
9    Mr. Castles, have you done so in email or just
10   over the phone?
11   A    Generally over the phone.  I mean, they may
12   send me an email that says, "Hey, you know, when
13   might you be available for deposition," or, "Can
14   you call me to discuss potential deposition
15   dates?"
16        At some point, I'm sure they sent an email
17   that said, "Here's a link to download file
18   materials," but nothing substantive has been
19   exchanged in email besides that kind of stuff.
20   Q    And it's my understanding that you didn't
21   personally take the measurements you relied on for
22   this case; is that correct?
23   A    That's correct.  I had my colleague and my
24   FARO scope out to do the laser scanning to provide
25   me that data.

BRIAN M. BOGGESS, MS, PE

```
 1         MS. CARROWAY:  All right.  Mr. Boggess,

 2    I feel like that's all the questions I have

 3    in this case.  Please answer any questions

 4    either of your attorneys may have.

 5         THE WITNESS:  Okay.

 6         MR. GENDE:  I have no --

 7         MR. CASTLES:  I don't have any

 8    questions.

 9         (There being no further questions, the

10    deposition concluded at 3:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

BRIAN M. BOGGESS, MS, PE

```
1                    CERTIFICATE OF REPORTER

2         I, Cassandra E. Vance, Court Reporter
     and Notary Public in and for the State of
3    South Carolina, do hereby certify that I
     reported the deposition of BRIAN M. BOGGESS,
4    M.S., P.E., on the 27th day of February,
     2025; that the witness was first duly sworn
5    by me, and that the foregoing 27 pages
     constitute a true and correct transcription
6    of the said deposition.

7         I further certify that I am neither
     attorney nor counsel for, nor related to or
8    employed by, any of the parties connected
     with this action, nor am I financially
9    interested in said cause.

10        I further certify that the original of
     said transcript shall be hereafter sealed and
11   delivered to Lauren Heath Carroway, Esq.,
     Morgan & Morgan, 1544 Fording Island Road,
12   Suite A, Hilton Head, South Carolina 29926.

13        This sealed original transcript shall be
     retained by the above party, who shall be
14   responsible for filing same with the Court
     prior to trial or any hearing which might
15   result in a final order on any issue.

16        IN WITNESS WHEREOF, I have hereunto set
     my hand and seal this 6th day of March, 2025.

17

18

19

20   _____
     Cassandra E. Vance, Court Reporter
21   Notary Public for South Carolina
     My commission expires:  12-13-2027
22

23

24

25
```

BRIAN M. BOGGESS, MS, PE

```
 1              VERIFICATION OF DEPONENT

 2

 3       I, BRIAN M. BOGGESS, M.S., P.E., have

 4   read the foregoing deposition testimony,

 5   which was reported by Cassandra E. Vance,

 6   Court Reporter and Notary Public in and for

 7   the State of South Carolina, on February 27,

 8   2025.

 9

10       I find the transcript of the deposition

11   to be a true and accurate transcript

12   according to my testimony on that date, with

13   the exception of _____ corrections as

14   listed on the attached errata page, which was

15   filled in by me.

16

17

18

19              _____

20              BRIAN M. BOGGESS, M.S., P.E.

21              _____, 20____.

22

23

24

25
```

BRIAN M. BOGGESS, MS, PE

Page 30

```
 1              E R R A T A   P A G E

 2    Page # Line #   Change/Correction (and Explanation)

 3    _____   _____

 4    _____   _____

 5    _____   _____

 6    _____   _____

 7    _____   _____

 8    _____   _____

 9    _____   _____

10    _____   _____

11    _____   _____

12    _____   _____

13

14

15

16         The above changes were noted by me on

17    this errata page before signing the attached

18    Verification of Deponent.  I have retained a

19    copy of this errata page for my records, and

20    the court reporter is to attach this page and

21    my verification to the original transcript.

22

23

24

25    Dated:  _____  _____
```

# Deposition Errata Sheet

**Deponent:**        Brian M. Boggess, P.E.
**Deposition Date:**   February 27, 2025
**Reporter:**        Cassandra E. Vance
**Case Caption:**     Marberger v. Nivens, et al.
**Case Number:**     3:22-cv-02375-MGL

<u>Declaration under Penalty of Perjury</u>

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the Deposition Errata Sheet hereof, with the understanding that I offer these changes as if still under oath.

| Page/Line | Change Request |
| --- | --- |
| 005/16 | Insert "an analysis of" between "completed" and "what" |
| 008/11 | Insert ", but my associated did." after "not" |
| 012/03 | Change "axles" to "axle" |
| 017/06 | Change "Peterbilt's" to "Peterbilt" |
| 017/06 | Change "propellant" to "to propel it" |
| 020/04 | Insert end quotation mark after me. |
| 020/04 | Delete "I" |
| 020/05 | Delete "didn't - - you know |
| 026/23 | Change "my" to "he used" |
| 026/24 | Insert "a" before "FARO" |
| 026/24 | Change "scope out" to "scanner" |

By: _Brian Boggess_        Date: _3/19/2025_
     Brian M. Boggess

State of North Carolina, County of Mecklenburg

Sworn to and subscribed before me on this
__19__ day of March, 2025.

_Amanda S James_
     Notary Public

AMANDA S JAMES
NOTARY PUBLIC
GASTON COUNTY, NC

(seal)

My Commission expires:        04/19/2026